Argued and submitted May 7, the decision of the Court of Appeals and judgment of the district court affirmed August 29, 1991

STATE OF OREGON,
*Respondent on Review,*

*v.*

RICHARD LOYD GALLIGAN,
*Petitioner on Review.*

(DC DA 415 327A; CA A65406; SC S37809)

816 P2d 601

Mary Reese, Deputy Public Defender, Salem, argued the cause for petitioner on review. On the petition was Sally L. Avera, Public Defender, Salem.

Jas. Adams, Assistant Attorney General, Salem, argued the cause for respondent on review.

PETERSON, C. J.

## PETERSON, C. J.

The issue presented is whether an inmate at a correctional facility who is given authorization to leave the facility for work but fails to return to the facility at the appointed time may be charged with the crime of "unauthorized departure." ORS 162.175.

The defendant was an inmate at a corrections facility, the Multnomah County Restitution Center (MCRC). He was released temporarily from the MCRC on a work-release program but failed to return to the MCRC at the scheduled time. He was convicted of the crime of "unauthorized departure" under ORS 162.175, a Class A misdemeanor. The Court of Appeals affirmed the conviction from the bench. *State v. Galligan,* 105 Or App 131, 803 P2d 787 (1990). We affirm the decision of the Court of Appeals and the judgment of the district court.

ORS 162.175(1)(a) states:

"A person commits the crime of unauthorized departure if:

"(a)   The person makes an unauthorized departure[.]"

ORS 162.135(7) defines "unauthorized departure" as

"the unauthorized departure of a person confined by court order in a juvenile facility or a state hospital that, because of the nature of the court order, is not a correctional facility as defined in subsection (2) of this section, *or the failure to return to custody after any form of temporary release or transitional leave from a correctional facility.*" (Emphasis added.)

ORS 162.135(3) provides:

"As used in ORS 162.135 to 162.205, *unless the context requires otherwise*:

"* * * * *

"(3)   *'Custody'* means the imposition of actual or constructive restraint by a peace officer pursuant to an arrest or court order, *but does not include detention in a correctional facility,* juvenile facility or a state hospital." (Emphasis added.)

The problem arises because ORS 162.135(7) defines "unauthorized departure" as the "failure to return to *custody* after temporary release * * * from a correctional facility" and ORS 162.135(3) states that "custody" "does not include detention in a correctional facility." (Emphasis added.) The defendant reasons:

1.   An essential element of the crime of "unauthorized departure" is that the defendant "fail[] to return to *custody*." ORS 162.135(7) (emphasis added).

2.   "Custody * * * does not include detention in a correctional facility." ORS 162.135(3).

3.   The MCRC is a correctional facility.

4.   Therefore, he cannot be convicted of "unauthorized departure" for his failure to return to the MCRC.

Before 1989, there was no crime of "unauthorized departure."[1] An inmate who failed to return to a correctional facility following a grant of temporary leave was chargeable with "escape in the second degree," a Class C felony. ORS 162.155. In 1987 (and still), ORS 162.155 provided in part:

"(1)   A person commits the crime of escape in the second degree if:

"* * * * *

"(b)   Having been convicted or found guilty of a felony, the person escapes from custody imposed as a result thereof; or

"(c)   The person escapes from a correctional facility[.]"

Consistent with the separate treatment in ORS 162.155(1)(b) and (c) of those escaping from "custody" and those escaping from a "correctional facility," the 1987 definition of "custody" excluded "detention in a correctional facility." However, the 1987 version of ORS 162.135(4) defined "escape" as including "failure to return to custody after temporary leave * * * from * * * a correctional facility."

In 1989, the legislature amended ORS chapter 162 to create the crime of "unauthorized departure," ORS 162.175.

---

[1] Before amendment, ORS 162.175 (1987) made it a misdemeanor only to "aid[] another in making or attempting to make an unauthorized departure from a juvenile facility or a state hospital."

Accordingly, the legislature deleted the phrase, "the failure to return to custody after temporary leave * * * [from] a correctional facility," from the definition of "escape," ORS 162.135(4) (1987), and amended the definition of "unauthorized departure" to include "the failure to return to custody after any form of temporary release * * * from a correctional facility," ORS 162.135(7). Or Laws 1989, ch 790, § 53. The legislature did not, however, amend ORS 162.135(3), which continued to exclude "detention in a correctional facility" from the definition of "custody."

The "definitions" statute concerning escape and related offenses, ORS 162.135, begins with the clause "unless the context otherwise requires." In order to give effect to all the provisions of ORS 162.135,[2] and specifically in order to give effect to the last clause of ORS 162.135(7) — "or the failure to return to custody after * * * temporary release or transitional leave from a correctional facility" — the context of ORS 162.135 requires that a definition of "custody" other than the one in ORS 162.135(3) be applied.

When construing a statute, "the intention of the legislature is to be pursued if possible." ORS 174.020; *State v. Carrillo,* 311 Or 61, 65, 804 P2d 1161 (1991). In keeping with that rule of construction, this court has stated that a statute should not be construed "so as to ascribe to the legislature the intent to produce an unreasonable or absurd result." *State v. Linthwaite,* 295 Or 162, 170, 665 P2d 863 (1983).

The 1989 legislative history clearly demonstrates that to assign the ORS 162.135(3) definition of "custody" to the word "custody" as used in ORS 162.135(7) would void the entire last clause of ORS 162.135(7) and entirely thwart the legislative intent. *See Johnson v. Star Machinery Co.,* 270 Or 694, 704, 530 P2d 53 (1974) ("if the literal import of the words is so at variance with the apparent policy of the legislation as a whole as to bring about an unreasonable result, the literal interpretation must give way and the court must look beyond the words of the act").

---

[2] ORS 174.010 states:

"In the construction of a statute, * * * where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

Testimony before the Senate Judiciary Committee makes it clear that the crime of "unauthorized departure" was directed at those inmates who fail to return after temporary leave from a correctional facility. Testifying on behalf of the Oregon Criminal Justice Council, which introduced the legislation, Bob Durston explained:

"[SB 1073] relates to escapes and unauthorized departures. Section 51 amends ORS 162.135. It narrows the definition of 'escape' to exclude failure to return to custody from temporary leave. There's been a great amount of concern as to an alarming escape rate in Oregon. In fact, the escape from maximum and medium security facilities is very low compared to other states. The walkaway rate, however, is very high, and the Council determined or is recommending that there be a distinction between walkaways and escapes, and that it be reflected in the criminal code. And [SB 1073] is the effort to do that. The walkaway situation would then be added to the definition of unauthorized departure.

"* * * * *

"Section 52 [adding the crime of 'unauthorized departure'] amends ORS 162.175 to then expand the crime of unauthorized departure to reflect the change made to the escape definition and the definition of unauthorized departure." Tape recording, Senate Judiciary Committee, April 3, 1989, Tape 91, Side B at 285-339. (Sections 51 and 52 of SB 1073 were incorporated into the provisions of HB 2250 as sections 53 and 54, respectively.)

In amending ORS 162.135(7), the legislature arguably overlooked the need to amend ORS 162.135(3). Because the legislative intent is so clear, and because the context of ORS 162.135 requires it, we hold that the word "custody," as used in ORS 162.135(7), includes detention in a correctional facility.

The dissent asserts that we may not examine the legislative history of ORS 162.135, because ORS 162.135(3) (definition of "custody") is unambiguous. The dissent undeniably is correct that ORS 162.135(3), viewed alone, is unambiguous. The dissent overlooks, however, that this case concerns another part of the same statute, ORS 162.135(7), which defines the crime of unauthorized departure. When one attempts to reconcile the two sections of the same statute — ORS 162.135(3) and the last clause of ORS 162.135(7) — it

is apparent that the statutes, when read together, are in conflict. That creates the ambiguity.

The dissent also states that, "[a]s used in ORS 162.135(3), 'custody' means physical restraint in a correctional facility, or some other form of constructive restraint imposed by a correctional facility." 312 Or at 46. That is incorrect. The first clause of ORS 162.135(3) states that " '[c]ustody' means the imposition of actual or constructive restraint by a peace officer pursuant to an arrest or court order." The last clause of ORS 162.135(3) excludes from "custody," "detention in a correctional facility." The dissent would punish failure to return from transitional leave or temporary release from a correctional facility as a felony under ORS 162.155(1)(c). That interpretation nullifies the entire last clause of ORS 162.135(7) and judicially abolishes the very crime that the legislature intended to create, the crime of unauthorized departure, a Class A misdemeanor. ORS 162.175.

The interpretation that "custody" in ORS 162.135(7) means something different than "custody" in ORS 162.135(3) avoids the conflict, gives effect to both subsections (3) and (7), accomplishes what the legislature sought to accomplish, and avoids the *State v. Pirkey,* 203 Or 697, 281 P2d 698 (1955), problem referred to in the dissent's third to last paragraph.

The *Pirkey* problem arises only under the dissent's construction of the statutes. There is no *Pirkey* problem. Persons violating the second clause of ORS 162.135(7) should be charged with the crime of unauthorized departure. Because the 1989 legislature repealed the felony of "failure to return to custody after temporary leave * * * from a correctional facility," ORS 162.135(4) (1987), a person so failing to return may not be charged with the crime of second degree escape, a felony, under ORS 162.155(1)(c), as contended by the dissent. The person has not, given the 1989 amendments, escaped from a correctional facility, nor has he or she escaped from actual or constructive restraint. Such persons have failed to return to the correctional facility after temporary release or transitional leave.

The decision of the Court of Appeals is affirmed. The judgment of the district court is affirmed.

**VAN HOOMISSEN, J.,** dissenting.

This is a case of statutory construction. The majority holds that, as used in ORS 162.135(7), the word "custody" includes detention in a correctional facility. I respectfully dissent.

Every judge of this court recognizes that the context of ORS 162.135(7) (unauthorized departure) does not permit a coherent application of the definition of "custody" contained in ORS 162.135(3), and that the legislature made a mistake in 1989 when it failed to amend ORS 162.135(3). The question is whether we may correct that mistake.

ORS 162.135(7) defines "unauthorized departure" to be "the failure to return to *custody* after any form of temporary release or transitional leave from a correctional facility." (Emphasis added.) ORS 162.135(3) defines "custody" to be "the imposition of actual or constructive restraint by a peace officer pursuant to * * * court order, *but does not include detention in a correctional facility.*" (Emphasis added.) The Multnomah County Restitution Center (MCRC) is a correctional facility.

From the foregoing, I conclude that, under the facts of this case, ORS 162.135(7) and 162.135(3) operate to create a circumstance where the state could not prove a necessary element of the crime charged, *i.e.,* that defendant failed to return to "custody." The majority recognizes that, reading the statutory subsections literally, this result logically follows. Notwithstanding, the majority affirms defendant's conviction by disregarding what the statutory subsections explicitly say and by substituting its understanding of what the legislature must have meant them to say.

The majority first states:

"The problem arises because ORS 162.135(7) defines 'unauthorized departure' as the 'failure to return to *custody* after temporary release * * * from a correctional facility' and ORS 162.135(3) states that 'custody' 'does not include detention in a correctional facility.' (Emphasis added.)" 312 Or at 38.

Later in its opinion, the majority candidly acknowledges that the problem arises because the 1989 legislature overlooked the need to amend ORS 162.135(3). 312 Or at 39. The majority explains:

> "The legislature did not, however, amend ORS 162.135(3), which continued to exclude 'detention in a correctional facility' from the definition of 'custody.' " 312 Or at 39.

In an effort to avoid an unreasonable or absurd result, the majority resolves the inconsistency on the face of the two statutory subsections by relying on legislative intent and statutory context. My quarrel is with the majority's method of analysis that begins, not with what the statutory subsections explicitly say, but with a search for what the legislature must have meant them to say. The majority then construes the statutes to fulfill its conclusions about perceived legislative intent. Simplistic applications of the maxims of statutory interpretation may be useful tools for decision, but they do not substitute for specific analysis in the first instance. *State v. Wagner,* 309 Or 5, 9, 786 P2d 93 (1990). This dissent, then, analyzes the two bases on which the majority relies, and rejects them both.

## LEGISLATIVE INTENT

The pursuit of legislative intent is permissible when the words of a statute are ambiguous. *Whipple v. Howser,* 291 Or 475, 479-83, 632 P2d 782 (1981); *Easton v. Hurita,* 290 Or 689, 694, 625 P2d 1290 (1981). But here, the words of ORS 162.135(3) are *not* ambiguous. They state, unequivocally, that as used in ORS 162.135(7), the word "custody" "does not include detention in a correctional facility."

If the language of a statute is unambiguous but the legislature has failed to translate its intent into *operative* language, then no matter what the legislative history indicates, this court may not ignore the plain meaning of the unambiguous words and rewrite the statute to better serve some other perceived legislative intent. *See State ex rel Everding v. Simon,* 20 Or 365, 373-74, 26 P 170 (1891) (where the legislature has mistakenly not made the provisions necessary to carry out its intent, the court cannot by construction supply those provisions). The function of this court is to

interpret the law, not to make it. Judicial "fiddling" is simply not our line of work or, at least, it ought not to be.

In *Monaco v. U.S. Fidelity & Guar.*, 275 Or 183, 188, 550 P2d 422 (1976), this court stated:

> "Whatever the legislative history of an act may indicate, it is for the legislature to translate its intent into operational language. This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent. *Lane County v. Heintz Construction Co. et al*, 228 Or 152, 157, 364 P2d 627 (1961)."

And in *Berry Transport, Inc. v. Heltzel,* 202 Or 161, 166-67, 272 P2d 965 (1954), this court explained:

> "However, it is only in cases where the language used in a statute is ambiguous and uncertain that resort may be had to rules of statutory construction in ascertaining and declaring the legislative intent. It is elementary that when the legislature, in enacting a law, makes use of plain, unambiguous, and understandable language, it is presumed to have intended precisely what its words imply. There is no occasion to go beyond those words and their plain meaning to ascertain by application of the rules of statutory construction the legislative purpose. The words used speak for themselves."

*See also Curly's Dairy v. Dept. of Agriculture,* 244 Or 15, 20, 415 P2d 740 (1966) ("If the statute is clear and unambiguous, then the court may not resort to rules of statutory construction in ascertaining and declaring the legislative intent."); *State v. Young,* 74 Or App 399, 403, 145 P 647 (1915) (same); *Foster v. Goss,* 180 Or 405, 408, 168 P2d 589, 175 P2d 794 (1947) ("the court has no legislative powers and is not authorized to supply deficiencies in a statute").

Words that are defined in a definition statute are not ambiguous. In *Chapman Bros. v. Miles-Hiatt Investments,* 282 Or 643, 646, 580 P2d 540 (1978), this court explained:

> "The function of a definition section in a statute or regulation is to give the terms there defined the precise meaning intended by the draftsman whenever one of those terms is used in the statute, rather than what might otherwise appear to be their meaning in common usage or in other contexts, and thereby to exclude doubts and disputes based on reference to such extrinsic usage. The draftsman in effect asserts

that when the defined word appears in the operative sections of the statute, it has been used in full awareness of the definition given it for that statute and should be so understood by the reader."

Courts are bound by duly enacted statutory definitions, unless they are obviously absurd. *Bunnell v. Parelius,* 166 Or 174, 180, 111 P2d 88 (1941). ORS 162.135(3) is not obviously absurd. That statutory definition of "custody" clearly and unequivocally exempts "detention in a correctional facility" from the scope of ORS 162.175(1)(a), which defines the crime of "unlawful departure"; we are bound by that definition. Therefore, no reference to legislative history is permissible here.

Nevertheless, the majority has rewritten the definition of a term, *i.e.,* "custody," that the legislature has precisely defined. The majority directs that "the context of ORS 162.135 requires that a definition of 'custody' other than the one in ORS 162.135(3) be applied." 312 Or at 39. That is not interpretation, it is legislation. *See* ORS 174.010 (courts may not omit from statute what the legislature has inserted or insert what has been omitted). I find the notion that a statutorily defined word may have different meanings in the same statutory scheme more than troublesome. In this case, the statute might be unworkable, but fixing an unworkable but unambiguous statute is the legislature's responsibility, not ours.

## STATUTORY CONTEXT

Assuming, however, for the sake of argument, that ORS 162.135(3) is ambiguous, the majority's reliance on "context" also is flawed. The apparent objective of the 1989 legislative amendments to ORS 162.135 and 162.175 was to punish unlawful departure from *constructive* custody less severely than unlawful departure from *actual physical* custody. In 1989, the legislature took the language regarding constructive restraint, "including failure to return to custody after temporary leave granted for a specific purpose or limited period," from the definition of "escape" and moved it with some alteration to the definition of "unauthorized departure"; this move indicated its intent that departure from constructive restraint would now be punished as an unauthorized departure, a misdemeanor. As ORS 162.135(7)

is presently worded, however, no construction of the word "custody" can advance this legislative intent.

"Custody" means restraint, either physical restraint or constructive restraint. As used in ORS 162.135(3), "custody" means physical restraint in a correctional facility, or some other form of constructive restraint imposed by a correctional facility. "Unauthorized departure" is the failure to return to "custody" after any form of temporary release or transitional leave from a correctional facility. ORS 162.135(7). A person on temporary release or transitional leave, however, has been released only from the physical restraint of the correctional facility; that person has not been released from the constructive restraint of the correctional facility. If that person has not been released from constructive restraint, he or she cannot fail to return to "custody" because, by definition, "custody" includes constructive restraint. ORS 162.135(3). Thus, even though the majority concludes that the legislature intended to proscribe departure from the constructive restraint of a correctional facility, because of the way ORS 162.135 is written it is nonsensical to construe the word "custody" to include constructive restraint.

On the other hand, if the "custody" does not include constructive restraint, that word can mean only physical restraint. That construction, however, clearly is not consistent with the majority's assumed legislative intent. Under it, "custody" presumably would mean physical confinement within a correctional facility, whether that facility is a penitentiary, a jail, a work camp, a restitution center, or a home where the person was under "house arrest." The word would exclude work release or an intensive supervision program (ISP) where a convicted person must telephone, or report in-person to authorities as required (but otherwise is not in physical confinement). If "custody" were so defined, in some situations, including this case, ORS 162.135(7) could be used effectively to carry out the assumed legislative intent. However, in other situations that the legislature apparently intended ORS 162.135(7) to cover, the statute, so construed, could not do so.[1]

---

[1] For example, when one is on transitional leave, such as temporary leave before parole, no condition of leave requires that the person return to the actual physical

Read together, these conflicting definitional statements are nonsensical. The trial judge in this case clearly recognized the internal inconsistency which appears on the face of the two statutory subsections. The judge stated:

"The critical issue is whether ORS 162.135(3) is fatal to the state's ability to prosecute unauthorized departure cases such as those before me. * * *

"Without subsection (3), * * * there is no adequate basis for reaching 'constructive custody,' such as failure to return to ISP. The state cannot have it both ways. ORS 162.135(3) unavoidably excludes correctional facilities, so it cannot logically apply to the 'failure to return to custody after any form of temporary release or transitional leave from a correctional facility' without doing violence to the obvious legislative intent.

"* * * [T]here is no basis for reaching constructive custody in ORS 162.135(7) absent subsection (3), and subsection (3) cannot apply because 'the context otherwise requires.'

"I conclude * * * that a mere failure to return to report to ISP is not within the unauthorized departure statute unless the state is prepared to prove that ISP involves *actual* custody." (Emphasis in original).

Thus, the majority's conclusion, that in order to give effect to the last clause of ORS 162.135(7) a definition of "custody" other than the one used in ORS 162.135(3) must be applied, results in the conclusion that the failure to return from constructive custody is not a violation of ORS 162.175(1)(a). That clearly is contrary to legislative intent.[2]

---

restraint of the penitentiary. Therefore, that person could not be convicted of failing to return to custody. Yet, given the inclusion of the words "transitional leave" in the definition of unauthorized departure, the legislature clearly intended to permit the prosecution of people who violate the terms of their transitional leave by absconding and refusing to return to sign their parole papers. This same analysis also applies to those who are released from correctional facilities to work release or ISP. Thus, a definition of "custody" that includes only the concept of actual physical restraint would effect the legislative intent only partially, because people on temporary release could be prosecuted under ORS 162.175, but those on transitional leave could not.

[2] As for the majority's reluctance to reach "an unreasonable or absurd result," 312 Or at 39, suffice it to say that I agree with the Court of Appeals that that doctrine must be applied with caution to assure that the line between judicial recognition of a statute's apparent policy and judicial amendment of the legislation is not crossed.

If this court is to interpret a statutory scheme in pursuance of its assumed legislative intent, then this court must not construe the scheme so as to effect that intent only partially. Otherwise, this court would be acting as a super-legislature, omitting a whole class of persons from the scheme's purview. We must not omit from the statutory scheme what the legislature has included. ORS 174.010. There is no construction that this court may give the word "custody" that is in harmony with the context of the statutory scheme or that would fully promote the policies and objectives of the legislation. The legislature must address and solve the problem.

I hesitate to contemplate what the majority's construction of the statutory scheme means in the context of *State v. Pirkey,* 203 Or 697, 281 P2d 698 (1955). In that case, this court apparently found a violation of the Fourteenth Amendment (Equal Protection Clause) and of Article I, section 20, of the Oregon Constitution, where the statutes fixed no standards within which the grand jury or the magistrate could exercise its discretion in charging a misdemeanor or a felony for the same conduct.[3] Under the majority's construction of the statute here, the prosecutor could in the exercise of unguided discretion charge defendant with the misdemeanor of unauthorized departure, ORS 162.175, or with the felony

---

*Dennehy v. City of Portland,* 87 Or App 33, 40-41, 740 P2d 806 (1987).

In this case, there is nothing "unreasonable or absurd" in a literal reading of the statute, unless one is prepared to accept the proposition that any time the legislature makes a simple mistake, the result is "unreasonable or absurd." Far from being absurd, a literal reading here may mean only that the state should have prosecuted defendant for escape in the second degree, ORS 162.155(1)(c). That statute provides in part that "[a] person commits the crime of escape in the second degree if * * * the person escapes from a correctional facility." ORS 162.135(4) defines "escape" to be "the unlawful departure of a person from * * * a correctional facility." Persons committed to a correctional facility who are lawfully outside the facility on work release, transitional leave, or under ISP, are still confined therein for purposes of the escape statute.

[3] The precise holding in *Pirkey* was that the provision of the relevant statute "is unconstitutional." 203 Or at 708. It is not entirely clear from the opinion, however, whether that holding was based on the state or the federal constitution, or both.

The Oregon Constitution has no "equal protection" provision in so many words. However, when speaking of the state constitution's guarantee of equal protection, this court, no doubt, is referencing Article I, section 20.

of escape in the second degree, ORS 162.155(1)(c). The undisputed facts would support either charge. Defendant himself argued in the Court of Appeals that he should have been charged with escape in the second degree, ORS 162.155(1)(c), rather than with unauthorized departure. In future cases, defense counsel no doubt will argue that the majority's holding in this case makes the entire statutory scheme unconstitutional. *State v. Pirkey, supra,* 203 Or at 704-05.

I would hold that the state's evidence in this case was insufficient to establish all of the essential elements of unauthorized departure. Therefore, the trial court erred in denying defendant's motion for judgment of acquittal. Defendant's conviction should be reversed.

Unis, J., joins in this dissent.